EMN:CMP/RJN
F.#2010R00211

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

TAYYIB ALI MUNIR,
    also known as
    "Ali Tayyib Munir,"

        Defendant.

- - - - - - - - - - - - - - - - X

M12-0331

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF ARREST WARRANT

(T. 18, U.S.C., § 1349)

EASTERN DISTRICT OF NEW YORK, SS:

      MASATO DILORENZO, being duly sworn, deposes and states that he is a Special Agent of the Federal Bureau of Investigation ("FBI"), duly appointed by law and acting as such.

      In or about and between April 2010 and January 2012, both dates being approximate and inclusive, in the Eastern District of New York and elsewhere, the defendant TAYYIB ALI MUNIR, also known as "Ali Tayyib Munir," together with others, did knowingly and intentionally conspire to execute a scheme and artifice to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property in connection with the purchase and sale of securities of issuers with a class of securities registered under Section 12 of the Securities Exchange Act of 1934, specifically shares of public companies as to which MUNIR, together with others, possessed or

believed he possessed material, nonpublic information, contrary to Tile 18, United States Code, Section 1348(2).

(Title 18, United States Code, Section 1349)

The source of your deponent's information and the grounds for his belief are as follows:

1. I have been a Special Agent with the FBI for over six years. I am assigned to an FBI squad tasked with investigating Eurasian organized crime. My responsibilities currently include, among other things, investigating racketeering, securities fraud and other forms of fraud, extortion, bribery and other federal crimes.

2. I have personally participated in the investigation of the offenses discussed below. I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) reports made to me by other law enforcement agents and agencies, (c) information obtained from confidential sources of information, including financial records, (d) consensual recordings, and (e) a review of records obtained pursuant to grand jury subpoenas and of publically-available information. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge. Because this affidavit is being submitted for the limited purpose

of establishing probable cause for the arrest of the defendant TAYYIB ALI MUNIR, I have not set forth each and every fact learned during the course of this investigation. Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest.

## THE CONFIDENTIAL SOURCE

3. From approximately January 2008 to April 2010, the confidential source (the "CS"), a United States citizen, was the chief executive officer of a financial advisory and consulting firm based in New York, New York and in a country located in central Asia (the "Central Asian Country"). During that time period, the CS resided primarily in the Central Asian Country, and his/her clients there included various government entities of the Central Asian Country. The CS had a personal and professional relationship with a high-level government official (identified herein as co-conspirator #1, or "CC-1") of the Central Asian Country, which government was overthrown in a coup in April 2010. As a result of the coup, CC-1 fled to England and the CS fled to a country located in Eastern Europe (the "Eastern European Country").

4. After the April 2010 coup, the new government of the Central Asian Country charged CC-1 and the CS with, among other things, the theft of state assets, laundering stolen funds and other crimes arising from alleged corruption in the deposed

3

regime. In addition to the charges pending in the Central Asian Country, the CS also currently faces money laundering charges in Italy arising from a large and complex tax fraud scheme, which charges were filed in or about February 2010.

5. On June 2, 2011, United States Magistrate Judge Robert M. Levy authorized an arrest warrant for the CS, who at the time was still living in the Eastern European Country, based on complaint charging the CS with an extortion conspiracy conducted in the Central Asian Country, in violation of 18 U.S.C. § 1951(a).

6. In December 2011, the CS returned to the United States and agreed to cooperate with the United States government. The CS has admitted his/her activities in connection with insider trading and other criminal activity. The information provided thus far by the CS has been corroborated by, among other things, bank records, consensual recordings, information provided by other witnesses and public records.

### THE INSIDER TRADING SCHEME

7. The CS has provided the following information about a scheme to execute transactions involving securities of public companies based on material, nonpublic information ("inside information") engaged in by the defendant TAYYIB ALI MUNIR and others. Since approximately April 2010, the CS has managed CC-1's investments. Specifically, the CS engages in

4

online securities trading activity to invest funds held by CC-1 in two separate accounts at JSC Baltic International Bank ("BIB"), which is based in Latvia.[1] Although CC-1 controls both accounts, they are held in the name of a shell company registered in New Zealand and created to conceal CC-1's banking activities at BIB. One of the accounts, a trading account that currently holds securities with a cost basis value of approximately $45 million (the "Account"), is utilized for purposes of insider trading based on information that the CS has obtained from, among others, MUNIR, a citizen of Great Britain who is believed to reside in England and work in the financial industry. The CS met MUNIR and MUNIR's business associate ("CC-2") through mutual acquaintances, and MUNIR and CC-2 visited the CS in the Eastern European Country. The CS has since communicated with MUNIR and CC-2 primarily via online communication.

8. The CS, MUNIR and CC-2 refer to inside information as "edge" information. In the 2010-2011 time period, the CS invested CC-1's funds in the Account, with CC-1's knowledge and express authorization, in securities listed variously on stock exchanges in New York, London, Milan and Madrid, based on "edge"

---

[1] CC-1 has at least one other bank account, located at a Russian bank, from which CC-1 and the CS have engaged in insider trading. For purposes of this Complaint, however, all allegations regarding specific trades refer to information about the Account (as defined below).

5

information obtained from MUNIR and CC-2. This "edge" information often regarded upcoming mergers and takeovers.

9. These trades followed a general pattern: First, MUNIR and/or CC-2 would notify the CS that he and/or they had "edge" information regarding an unidentified security. In the initial conversation, MUNIR and/or CC-2 typically suggested the nature of the "edge" information – such as an upcoming merger or anticipated press coverage that was expected to influence the price of the security – and sometimes provided the relevant industry sector and the stock exchange where the security was listed. MUNIR and/or CC-2 also would state how much he and/or they expected to be paid for this inside information based on a virtual "position." For example, in exchange for the provision of inside information, MUNIR and/or CC-2 would demand the profits on a $2 million position, or investment, made by CC-1. In such a scenario, if CC-1 authorized the CS to invest $5 million, 40 percent of any profit would be owed to MUNIR and/or CC-2; MUNIR and/or CC-2, in turn, would claim that he and/or they had to pay his and/or their sources of the inside information. MUNIR and/or CC-2 also typically would provide a time horizon for holding the security based on the anticipated timing of when the inside information would become public.

10. After the initial conversation, described above, the CS would relay the information to CC-1, discuss whether to

invest and, if CC-1 expressed interest, how large a position to take. If CC-1 ultimately decided that the trade should be executed, CC-1 would contact BIB and notify the bank that the CS was authorized to use the Account to purchase securities in the previously agreed-upon amount. After receiving such authorization from CC-1, the CS would inform MUNIR and/or CC-2 of the position that CC-1 intended to take, and MUNIR and/or CC-2 would provide the CS with the name and/or ticker symbol of the security, suggest the timing for the purchase and sale of the security and sometimes suggest a limit price. At the appropriate time, the CS would then contact BIB to direct the bank to execute the trade in the amount that previously had been authorized by CC-1. Subsequently, after the "edge" information became public, the CS would contact BIB and direct the bank to sell the securities. Although some individual trades were unprofitable, in aggregate, CC-1 realized several million dollars in profit on such insider trades in the 2010-2011 time period.

11. The following trades involving American public companies, whose securities are traded on national stock exchanges (including the New York Stock Exchange ("NYSE") and the NASDAQ Stock Market, Inc. ("NASDAQ")), are registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l) and are required to file reports under Section 15(d) of

7

the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)), are representative of the pattern set forth above:

    a.    <u>Tyco International Ltd. ("Tyco") (NYSE)</u>: On or about April 6-7, 2011, with CC-1's authorization, as generally described above, the CS purchased approximately 105,309 shares of the stock of Tyco, with an approximate cost basis of over $5 million, using funds from the Account. This trade was based on information from MUNIR and CC-2 that Tyco was an imminent takeover target. CC-2 indicated that he was certain of this information and advised the CS to take a large position. MUNIR and CC-2 negotiated a 50-50 profit split with the CS and CC-1. Although the takeover did not occur, there was extensive press speculation about a possible takeover that boosted Tyco's stock price. The CS executed a sale of all the Tyco shares on April 13, 2011 and CC-1 realized a profit of approximately $390,000 on the trade.

    b.    <u>InterMune Inc. ("InterMune") (NASDAQ)</u>: On or about April 14-15, 2011, with CC-1's authorization, as generally described above, the CS purchased approximately 180,750 shares of InterMune stock, with an approximate cost basis of over $9 million, using funds from the Account. MUNIR and CC-2 negotiated an approximately 40-60 profit split with the CS and CC-1. CC-2 had advised the CS that CC-2 knew people working on a takeover deal involving bidding by two or three large pharmaceutical companies who wanted to acquire InterMune, a biotechnology company, for its patents, and that CC-2 anticipated the acquiring company would pay a 50 percent premium on the InterMune outstanding shares. To date, the merger has not occurred and the price of InterMune shares has dropped; as a result, CC-1 still holds the InterMune securities. As a result of the loss incurred on this and other trades, the CS and CC-1 advised MUNIR that they would no longer work with CC-2. In order to reduce the average cost basis, the CS, with CC-1's authorization, purchased additional shares of InterMune at even lower prices in May and July 2011, resulting in a current total cost basis of approximately $12.9 million. As described in further detail below, in

a recent consensually-recorded conversation with the CS, MUNIR indicated that if the CS could convince CC-1 to purchase another $1 million in InterMune securities, MUNIR has a contact who could drive the price of the stock up to approximately $28 per share, which would enable CC-1 to sell his entire block of shares for approximately $8 million.

c. <u>Global Industries Ltd. ("Global") (NASDAQ)</u>: On or about September 8-9, 2011, with CC-1's authorization, as generally described above, the CS purchased approximately 685,840 shares of Global (approximately 10 percent of the daily trading volume) based on information from MUNIR that Global was an imminent takeover target. The purchase price for these shares ranged from approximately $5.13 to $5.39 per share, with an approximate cost basis of over $3.6 million. Prior to the opening of the U.S. markets on September 12, 2011, Global and Technip SA, a French company, announced a merger whereby Technip would acquire the entire share capital of Global, paying $8 per share. Thus, on September 12, 2011, the CS liquidated CC-1's entire position of Global securities at prices ranging from approximately $7.77 to $7.80 per share, resulting in a profit of approximately $1.7 million. On September 16, 2011, however, the Securities and Exchange Commission ("SEC") filed a complaint entitled <u>Securities and Exchange Commission vs. One or More Unknown Purchasers of Securities of Global Industries, Ltd.</u>, Civil Docket No. 11-6500 (S.D.N.Y.), characterizing these transactions as "highly profitable and suspicious," and the proceeds of the trade were subsequently frozen.[2]

---

[2] In its complaint, the SEC alleged that "[u]pon information and belief, purchases of stock in this manner, that is, the timely purchases of a large quantity of Global common stock representing approximately 10 percent of the total daily trading in Global shares immediately before a major corporate announcement followed by the immediate liquidation of the position upon public release of the announcement . . . suggests that the information was obtained as a result of breaches of fiduciary duty." Based on subsequent publicly-filed documents in the SEC's case, it appears that although the SEC has identified

9

CONSENSUALLY-RECORDED CONVERSATIONS WITH THE DEFENDANT

12. Since the CS began cooperating with the government, the CS has engaged in a series of consensually-recorded conversations with CC-1 and MUNIR about past and future "edge" trades. As detailed below, in these conversations, MUNIR identified the sources of the successful inside information, such as the Global merger tip, by name or initials (referred to herein as "CC-3" and "CC-4," respectively), and repeatedly reminded the CS that these sources are demanding payment of at least $122,000 for past successful trades. MUNIR distinguished these sources from the "InterMune guys" who provided the unprofitable information about InterMune and other unsuccessful trades. Although CC-1 has paid MUNIR and/or CC-2 in the past, CC-1 has refused to make any further such payments as a result of, among other things, the unsuccessful InterMune investment and the SEC's freezing of the proceeds of the Global trade. MUNIR recently promised the CS that CC-3 and CC-4 can provide at least eight earnings reports in advance of their public announcement in January and February 2012, provided that the CS and CC-1 agree to pay the $122,000 demanded.

13. In a consensually-recorded conversation on or about January 3, 2012, for example, MUNIR suggested that his

---

BIB as the bank originating the trade on behalf of the New Zealand shell company, the SEC has not identified CC-1 as the beneficial owner of the Account.

10

sources (CC-3 and CC-4) would agree to give the CS all of the earnings reports 48 hours in advance of publication provided they are paid $122,000, which MUNIR claims they feel they are owed as a result of past profitable trades, such as the Global trade, notwithstanding the SEC action freezing the profits connected to the Global trade:

> So basically, I'm trying to make headway with these people, basically try to explain to them that, with regards to GL [Global] and what have you, because it's not resolved, they can't count that into anything because we don't know where we stand with it. . . . What they do have is eight earnings calls for Jan. You can have the physical you-know-what probably 48 hours beforehand so you can view it yourself, so you know exactly what you're going into, basically. Obviously, they want payment. They want their last trade to be paid out. So what I'm thinking is maybe we - I don't think [CC-1] is really going to go for that. There's eight of them. They're all for January. And you can physically see the report . . . . I got sent one of them, the reports . . . it didn't do much. It only went down 10 percent; you had to be pretty quick on the button to get out. There's a few shorts in there, there's a few longs in there, so we're going to need to be able to do both. . . . If we pay out that last trade, not only will we get the eight earnings things, we'll also get [CC-4's] trade. See what [CC-1] says. Don't forget, they're expecting 122. . . . If you negotiate with [CC-1], I don't know, to pay out 150 or something, then at least we [MUNIR and the CS] can get some dough because I'm pissing in the wind again.[3]

14. MUNIR and the CS again discussed the advance earnings reports in another consensually-recorded conversation on

---

[3]  The conversation excerpts quoted herein are based on draft transcripts that are subject to revision.

or about January 12, 2012. In this conversation, MUNIR indicated that CC-3's and CC-4's sources of inside information include an ex-director of the New York Stock Exchange:

> The earnings? Yeah, you get paperwork 48 hours in advance. . . . But also, you know who they've got? And this is someone, basically, the only reason why I wanted to pay that 122 . . . they're not only getting these earning with the paperwork 48 hours in advance, but they've also got the ex-director of the New York Stock Exchange . . . .[CC-3] -- him and another guy, them two work together. Total, through that one guy that gave us AV [Aviva, a London-listed stock that was the subject of a prior "edge" trade], GL [Global], and AV again, he, basically, him and [CC-3] and [CC-4] are all really close friends, right? . . . That's the only reason why I want to please this camp. A, we get this earnings stuff. . . . I mean, put it this way, if I can't keep this side of the camp happy - I've basically brought it down to 122 grand, but I would want you to get 150 out of him so at least we've got something. . . . The reason why I want these guys is because this is it - once we have them, we don't need anybody else. And they've given us pretty good stuff . . . .[T]here's always <u>something</u> behind it. . . . There's always <u>something</u>. It might not move, but at least - the reason I like them is because they actually do what they say they're going to do. Even - they said with this earnings stuff, "You'll get everything. You'll get all the earnings stuff. It doesn't mean you're going to make on everything. It's up to you."

Also in this January 12, 2012 conversation, MUNIR suggested for the first time that he might be able to provide inside ("edge") information about initial public offerings ("IPO"), telling the CS, "What if we had a little 'in' with IPOs? Pre-IPO stuff, yeah. Small investment stuff, I'm talking a couple hundred thousands of dollars. . . . If you've got a couple hundred grand

12

tied up and you make 50-60 percent on it, that's still money, money well-placed. . . . <u>I've made it quite clear that I want an edge</u>."

15. On or about January 14, 2012, MUNIR and the CS discussed the plan to pump up the price of InterMune, as described above, which would facilitate selling off the stock, thus cutting CC-1's losses. According to the CS, MUNIR's reference to a "bar" means an additional $1 million investment. MUNIR stated:

> The InterMune guys, I think they're going to carry on without us and do it anyway. They called me up and they go, "Listen, if you're willing to pay out a bar on your position, we'll get it up to $28 within the next two to three weeks." . . . They're going to tell me exactly. . . . We'd recover about 50 percent of what we lost. . . . I can get us out of InterMune, I know they can do it. I just want to know what it is they're proposing.

Based on prior advance information about press coverage that MUNIR and CC-2 have provided to the CS, the CS believes that MUNIR's InterMune plan will likely involve floating favorable information about InterMune to boost the price and facilitate selling the stock. To the extent that the information planted in the media is false or materially misleading, this plan may amount to what is commonly known as a "pump and dump" scheme, which is another form of securities fraud.

13

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for the defendant TAYYIB ALI MUNIR so that he may be dealt with according to law.

FURTHER, your affiant requests that the Court order that this Complaint, as well as any arrest warrant issued pursuant to this Complaint, be sealed, until further order of the Court, to avoid alerting the defendant and his co-conspirators to the existence of this investigation and to protect the safety of the CS and the CS's family.

Dated:   Brooklyn, New York
         April 2, 2012

_____
MASATO DiLORENZO
Special Agent
Federal Bureau of Investigation

Sworn to before me this
2nd day of April, 2012

AK
GE

14